IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 16, 2003 Session

# ROBERT L. "LARRY" CARRIER v. SPEEDWAY MOTORSPORTS, INC., ET AL.

**Appeal from the Chancery Court for Sullivan County**
**No. 17-294(L)     Thomas R. Frierson, II, Chancellor**

**FILED MAY 27, 2004**

**No. E2002-02724-COA-R3-CV**

This case involves a dispute as to exactly what property was leased to the plaintiff, Robert L. "Larry" Carrier. In January, 1996, the plaintiff and his family sold their 100% stock ownership interest in National Raceways, Inc., to the defendant, Speedway Motorsports, Inc. ("SMI"). National Raceways, Inc., operated the well-known Bristol Motor Speedway ("the Speedway"). In conjunction with the sale, the parties executed a lease agreement, wherein SMI leased back a portion of the Speedway's property to the plaintiff. The plaintiff filed suit against SMI and Bristol Motor Speedway, Inc., the new corporate name of National Raceways, Inc., claiming that the defendants had breached the lease by interfering with the plaintiff's leasehold interest. Specifically, the plaintiff claims that the lease covers a 15.54 acre parcel of land lying adjacent to the grandstand at the racetrack. The defendants answered, denying that they had breached the lease and asserting that the subject matter of the lease is limited to three buildings on the 15.54 acre tract rather than to the entire tract. The defendants also filed a counterclaim for an unpaid debt. Following a bench trial, the court found in favor of the plaintiff, concluding that the lease involves the entire parcel of land rather than just the three buildings. It ultimately awarded the plaintiff damages of $2,401,728. The trial court dismissed the defendants' counterclaim. From this judgment, both sides appeal.[1] We affirm the dismissal of the counterclaim, but reverse the trial court's judgment in favor of the plaintiff on the original complaint. That complaint is dismissed at the plaintiff's costs.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part and Reversed in Part; Complaint Dismissed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., E.S., and WILLIAM H. INMAN, SR. J., joined.

Cecil W. Laws, Kingsport, Tennessee, for the appellant, Robert L. "Larry" Carrier.

---

[1]Since the plaintiff filed his notice of appeal first, he was designated as the appellant.

Dwight E. Tarwater and Travis Graham, Knoxville, Tennessee, for the appellees, Speedway Motorsports, Inc. and Bristol Motor Speedway, Inc.

**OPINION**

I.

In the early 1960s, the plaintiff opened the Speedway in Sullivan County. While the Speedway had various owners over the next several years, the plaintiff reacquired the property in the mid-1980s and continued to own and operate the Speedway through his family corporation, National Raceways, Inc., over the next ten years. The plaintiff, his wife, Shirley Carrier, and his two sons, Mark Carrier and Andy Carrier, were the sole shareholders of National Raceways, Inc. In addition to conducting two NASCAR-sanctioned races at the Speedway each year, National Raceways, Inc., facilitated professional boxing matches in a boxing arena on the property. The Speedway's real property consists of more than 100 acres of land. The 15.54 acre tract at issue in this case is located within the 100 acres.

In mid-January, 1996, Bruton Smith, Chief Executive Officer of SMI, contacted the plaintiff and inquired about purchasing the Speedway. The plaintiff offered to sell the common stock of National Raceways, Inc., to Smith for a price of $20,000,000, net of taxes.

On Friday, January 19, 1996, Smith traveled to Bristol, along with William R. Brooks, Chief Financial Officer of SMI, and Fred T. Lowrance, SMI's attorney. They met with the plaintiff and the plaintiff's attorney, A. D. Jones, Jr., at the offices of the plaintiff's accountants, Dent K. Burk Associates, P.C. ("the Burk offices"). At the meeting, SMI, through attorney Lowrance, presented a one-page stock purchase agreement that he had prepared at SMI's request. The parties negotiated over the terms of that agreement, and their negotiations included a discussion regarding the leasing back to the plaintiff of the boxing arena located near the racetrack. No final agreement was reached at this meeting.

Throughout the weekend, the attorneys, Lowrance and Jones, continued to negotiate and exchange proposals. On Monday morning, January 22, 1996, Jones, on behalf of the plaintiff, faxed another proposal to Lowrance. That afternoon, Smith and Brooks of SMI, along with Lowrance, returned to Bristol, and the parties once again met at the Burk offices. After the plaintiff received a competing offer for the Speedway from a third party, the plaintiff was informed by SMI that his price was satisfactory and that SMI had already deposited $20,000,000 into the plaintiff's bank account. The parties then reviewed both the stock purchase agreement ("the sales agreement") and the lease. Later that same afternoon – January 22, 1996 – the parties left the Burk offices and traveled to the Speedway premises, where they executed the sales agreement and the lease. The sales agreement provides, in pertinent part, as follows:

**LEASE OF BOXING ARENA AND GARAGE:**

Buyer hereby leases to Robert L. "Larry" Carrier for five (5) years from the date of this agreement at a rental rate of One Dollar ($1.00) per year, payable by Robert L. "Larry" Carrier to Buyer by no later than January 31 of each year, the boxing arena, adjacent trailer and 2-bay garage shown as area A on Exhibit 1 attached hereto. Robert L. "Larry" Carrier shall have the option to extend the lease of the boxing arena, adjacent trailer and garage for an additional five (5) years at a rental rate of One Dollar ($1.00) per year. . . .

Buyer and Seller shall have the right to use the area around the boxing arena, adjacent trailer and garage for parking at all times. Robert L. "Larry" Carrier, his heirs or assigns, hereby indemnifies and holds Buyer harmless against any liability, loss or damage (reasonable wear and tear excepted) incurred as a result of his use of the boxing arena, adjacent trailer or garage arising out of any event or activity held at the boxing arena, adjacent trailer or garage.

(Capitalization, underlining and bold type in original; paragraph numbering omitted). Not included in the sale is a 72 acre campground next to the Speedway's property that the plaintiff retained and continued to operate. The campground was used by patrons of racing events hosted at the Speedway.

The pertinent provisions of the lease[2] are as follows:

[SMI] does hereby let and lease unto [the plaintiff] . . . for a period of five (5) years, commencing on the 1st day of January, 1996, and ending on the 1st day of January, 2001, certain property located in the Fourth (4th) Civil District of Sullivan County, Tennessee currently owned by National Raceways, Inc. and commonly known as "Bristol Boxing Arena["], adjacent mobile home and adjoining "2-bay" storage building currently used by Mark Carrier for garage purposes along with adjacent parking facilities and all existing rights of way or easements for ingress and egress related thereto as more particularly shown as area A on Exhibit 1 attached hereto.

\*   \*   \*

---

[2]Apparently, the lease was executed so it could be recorded separate and apart from the terms pertaining to the sale of the common stock of National Raceways, Inc.

> [The plaintiff] shall have the option to extend the lease of the above-described property for an additional five (5) years at a rental rate of One Dollar ($1.00) per year. . . .

(Underlining in original). The boxing arena was used by the plaintiff's son, Mark Carrier, a one-time professional boxer. The son's trainer lived in the double wide trailer, and the garage was used to store Mark Carrier's race cars.

The critical issue in this case is whether the subject matter of the lease is the boxing arena, the trailer, and the garage, or the *entire* 15.54 acre parcel of land on which those structures are located. The 15.54 acre parcel of land has a shape similar to a bow-tie, and the parties often referred to it as the "bow-tie parcel." The tax map utilized by the parties is attached as Appendix A to this opinion. While there is a sharp dispute between the two sides as to whether the boundary lines of the 15.54 acre parcel were highlighted in yellow on the tax map at the time the sales agreement and lease were executed, it is undisputed that the document attached as Appendix A did contain, at that time, the roughly-drawn outlines of the three buildings as shown on the appendix.

Two months after the closing – during the weekend of March 30, 1996 – SMI conducted its first NASCAR race at the Speedway. Immediately following the race, SMI embarked upon a construction project to enlarge and enhance the existing Speedway facilities – a project that would not be finally completed until May, 1997. The project included the construction of sky boxes, grandstands, loading docks, and restrooms, on the premises of the Speedway, specifically on the 15.54 acre parcel of land in dispute in this case. In May, 1996, the plaintiff offered to sell his leasehold interest to the defendants for $728,000. In pertinent part, the plaintiff's letter of May 4, 1996, to SMI's CEO Smith made the following proposal:

> Jeff Byrd has asked me to give a price on fore-going [sic] my 10 year agreement on vacating the Bristol Sports Arena, Wes Ramey's double-wide modular home and Mark's [sic] Carrier drag racing facility.
>
> I have used replacement figures in calculating a fair price to get this accomplished.
>
> The Bristol Sports Arena would cost $750,000 to replace not counting land that I would have to come up with to re-build such a facility.
>
> Wes Ramey's trailer could be replaced for $30,000 although I don't have a location for it; Mark Carrier's garage cost $48,000 to build.
>
> The total for vacating the three buildings is as follows:

-4-

| Bristol Sports Arena | $650,000 |
| Wes Ramey's residence | $ 30,000 |
| Mark Carrier Racing Facility | $ 48,000 |
| TOTAL: | $728,000 |

I would like to have $728,000 to vacate the agreement.

As can be seen, the letter makes no reference to the 15.54 acre tract of land. Significantly, subsequent correspondence – some four letters – from the plaintiff or his representative to SMI also refer to one or more of the structures specifically mentioned in the sales agreement and lease. However, none of this correspondence refers to the 15.54 acre tract as being the subject of the lease.

In December, 1996, the plaintiff wrote to SMI's CEO Smith that construction work around the boxing arena was obstructing the parking area around the arena, thus requiring the plaintiff to hold his boxing events elsewhere. Byrd, on behalf of the Speedway, responded that the Speedway believed that it "had satisfied every request that [the plaintiff] and [the plaintiff's general manager] had made" with respect to parking issues, but that the Speedway would continue to make sure "that the roads and lots are in good shape for all [the plaintiff's] events at the boxing arena." On December 18, 1996, the plaintiff's attorney, Jones, in one of the four letters referenced in the preceding paragraph of this opinion, notified Smith that the plaintiff considered the defendants to be in breach of the lease due to the "on going [sic] construction work on [the Speedway] property adjacent to the [boxing arena]." In this letter to SMI's Smith, attorney Jones referred to "the lease agreement of *Bristol Sports Arena*." Again, there was no reference to the lease as being of the 15.54 acre tract.

The defendants' construction project alluded to earlier in this opinion included the addition of 38,000 seats and 25 sky boxes. The resulting structure was partially located on the 15.54 acre parcel in dispute. *Almost five years after the construction project was completed*, the plaintiff, on February 10, 2002, filed the instant action, claiming that the defendants had breached the lease agreement by utilizing, and constructing improvements upon, the 15.54 acre parcel of land which the plaintiff claimed he had leased from the defendants. The defendants answered, denying that they had breached the lease. In addition, the defendants counterclaimed for damages of approximately $175,000, relating to a debt they asserted the plaintiff never repaid.

The case proceeded to trial in late May and early June, 2002. Numerous witnesses testified over the course of the six-day trial. The plaintiff did not testify. Beginning sometime in 1996, he began to suffer from Alzheimer's disease. By the time of the trial, the disease had progressed to a point where he was unable to testify. Apparently, the plaintiff was never deposed, presumably for this same reason.

The crucial testimony at trial centered upon *one* of several copies of the tax map, Appendix A to this opinion. This particular copy was attached to one of the four originals of the lease. The tax map in question had yellow highlighting tracing over the lines of the 15.54 acre "bow-tie" piece

of property. It was *not* labeled as "Exhibit 1." Copies of the same tax map attached to the other three originals of the lease agreements and all of the originals of the sales agreement were apparently *not* highlighted and *were* all labeled as "Exhibit 1."

The first witness to testify at trial was the plaintiff's attorney, Jones. With respect to the sales agreement and the lease, both of which were executed on January 22, 1996, Jones explained that four originals of each document were signed by the parties and that one original of both the sales agreement and the lease was on bond paper, while the other three originals of each document were on more of a copy type paper. When Jones arrived for the closing, he had the tax map attached to both of the bond-paper originals. It clearly showed the 15.54 acre parcel of land, among other things. (See Appendix A). Because the map did not show any structural improvements to the land, the parties – prior to the closing – had drawn three boxes on the map within the bow-tie parcel and indicated that the boxes represented the "sports arena" (also known as the boxing arena), the "trailer" and the "garage." At the closing, SMI's attorney, Lowrance, told Jones that the tax map needed to be labeled as "Exhibit 1," since it was referred to in that manner in both the sales agreement and the lease. Jones then removed the tax map from the bond-paper sales agreement, marked it as Exhibit 1, and made several photocopies of that map. He then reattached that map to the bond-paper sales agreement and attached the photocopies to the three original copy-paper sales agreements and the three original copy-paper lease agreements. Because the original bond-paper lease agreement already had a tax map attached to it, Jones did not remove it and replace it with a photocopied tax map. This, as Jones explained at trial, is the reason why the tax map attached to the bond-paper original lease is not labeled as Exhibit 1.

The trial court received into evidence the highlighted copy of the tax map. It was offered by the plaintiff and appeared for the first time at the trial. The highlighting traced over a black line that set out the tax assessor's boundary lines of the bow-tie parcel. It is obvious from the nature of the document that this black boundary line was already on the tax map before these parties began their negotiations in this matter. Similar black boundary lines are shown on the tax map as designating other parcels of property for tax purposes.

The plaintiff's attorney, Jones, testified that, on Friday, January 19, 1996, when the parties first met at the Burk offices to discuss the sale of the Speedway, he unrolled a large tax map and pointed out the various parcels of land that were being discussed. Among these parcels, Jones stated, was the 15.54 acre bow-tie parcel that contained the boxing arena and other pertinent buildings. Jones testified that he traced his finger around the perimeter of this parcel. The parties designated this as "A" on the tax map for ease of reference, since at that time there were discussions pertaining to other parcels of land as well.[3] Jones stated that, to him, "A" meant the entire 15.54 acre parcel and *not* just the buildings at issue. In addition, Jones stated that, when the parties referred to the lease of the boxing arena or sports arena, that was just a "shorthand" term for the entire 15.54 acre parcel.

_____

[3]At two places on the tax map, there can be found the designation "B." See Appendix A.

As to the actual signing of the sales agreement and the lease at closing, Jones explained that he and the plaintiff were in one room, and that SMI's Smith was in another room. The documents were taken back and forth between the rooms for signatures, so Jones and the plaintiff did not actually witness Smith signing the documents.

Jones was questioned extensively about the highlighting on the recently-produced, and admitted-into-evidence tax map. Jones testified that he believed the tax map attached to the original bond-paper lease was highlighted when the parties signed it, but he "can't be 100 percent sure." However, the defendants pointed out that, in his deposition, Jones stated that he didn't "recall whether or not it was actually highlighted on the original lease" prior to signing, whereas at trial, Jones stated that he "believe[d]" it was highlighted before signing.

The defendants also questioned attorney Jones about drawing the boxes to represent the buildings on the tax map. Jones admitted that, as an attorney, he was aware that when drawing up a lease, the buildings on the leased property are included in that lease unless they are excepted out. However, Jones stated that the buildings were drawn on the map to indicate their placement because they were located very close to the property line of the bow-tie parcel.

The next witness to testify was the plaintiff's son, Mark Carrier. Mark Carrier claimed that, on the day the sales agreement and the lease were signed, he specifically asked attorney Jones about the boxing arena and one of the other buildings. He testified that Jones took out the highlighted tax map and traced his finger over the highlighted boundary to show him what was being leased back to the plaintiff. The witness testified that the lease had not yet been signed at that time and that he did not sign the lease, as he was not a party to that agreement. He also admitted that the sales agreement he signed that day did not have a highlighted tax map attached to it.

Brooks, SMI's CFO, testified next. He stated unequivocally that it was his understanding that SMI was leasing *only* the boxing arena, trailer, and garage back to the plaintiff, *not* the entire 15.54 acre parcel of land. He further testified that he never saw the large tax map that Jones stated he showed the participants at their initial meeting on January 19, 1996, and that he does not remember seeing any highlighting on the tax map attached to the original bond-paper lease when Smith, SMI's CEO, signed that document on January 22, 1996. Smith testified similarly, stating that he never saw a highlighted map and that he only leased the boxing arena, the garage, and the trailer to the plaintiff. Smith also testified that he "never, ever leased any land to [the plaintiff] or any of his family."

The plaintiff's former business partner, Ron Scalf, testified that he was present on the day the agreements were signed and that he assisted Jones in photocopying the tax map for attachment to the documents. Scalf's testimony with respect to the highlighting was nothing if not conflicting. At trial, Scalf stated that he "would guess eight to 10" copies of the tax map were highlighted in yellow. In his deposition, Scalf stated that Jones highlighted the map while they were in the copy room, but that he "[didn't] remember" how many copies were highlighted. He then stated in his deposition that his copy of the tax map and the plaintiff's copy were both highlighted.

-7-

Among the other witnesses to testify was Byrd, vice president and general manager of the defendant, Bristol Motor Speedway, Inc. Byrd testified that the plaintiff only "had the right to use the [three] buildings." Finally, SMI's attorney, Lowrance, testified. He stated that he reviewed the sales agreement and the lease before Smith signed them and that the documents Smith signed at the closing did not have any yellow highlighting on them. He further stated that "A" referred only to the three buildings, not the entire bow-tie parcel of land. Lowrance testified that if the plaintiff had actually leased the land,

> it would have said "X parcel of land" by some tax reference, by acreage, by deed reference or at least, "We're leasing a parcel of land." Some reference to a land – parcel of land, a tract of land of some sort.

Finally, Lowrance disputes that Jones ever took out a large tax map at the initial Friday meeting and pointed out parcels of land.

At the conclusion of the trial, the trial court took the case under advisement. It filed its 15-page memorandum opinion on October 11, 2002. After analyzing the facts of the case in light of applicable Tennessee contract law, the court made the following ruling:

> Based upon the foregoing analysis, this Court concludes that the parties' stock purchase agreement and separate lease agreement executed contemporaneously with commonality of parties, purpose and transaction should be construed together as one contract. As the provisions of the lease agreement explain in greater detail the specific rights, liabilities and obligations between the parties respecting the leasehold interest, such provisions shall be given effect.

> The language of the lease contract executed by [the plaintiff] and [SMI] on January 22, 1996 is clear and unambiguous and therefore, should be construed as written. This Court shall apply to those words used their ordinary meaning and neither party shall be favored in their construction. With respect to the location of the leased premises, the lease agreement specifically identifies the leasehold property as the "Bristol Boxing Arena, adjacent mobile home and adjoining two bay storage building currently used by Mark Carrier for garage purposes along with adjacent parking facilities" as particularly shown by area "A" on Exhibit 1 attached thereto. The evidence preponderates in favor of a finding that the original lease agreement has an attached copy of the respective tax map showing area "A" as encompassing a 15.54 acre tract, the perimeter boundary of which is highlighted in yellow. The original stock purchase agreement contains an attached Exhibit 1 designating the same area "A" by means of a dark solid line

along the perimeter boundary. This Court concludes that the original lease agreement introduced as Trial Exhibit 243-A establishes the location of the leased premises as being 15.5[4] acres improved by a sports arena, trailer, garage and parking lot facilities and as depicted by survey introduced as Trial Exhibit 230, a copy of which is attached to this Opinion as Attachment A.

(Footnote omitted). The trial court went on to find that the defendants had breached the lease agreement. The court awarded the plaintiff "exclusive possession of the leased premises for the duration of the extended term of the lease." The court then awarded compensatory damages to the plaintiff in the amount of $1,199,655,[4] plus prejudgment interest of $172,071, for a total award of damages of $1,371,726.[5] The trial court denied the plaintiff's additional claims for relief, including a claim for punitive damages. Finally, the court dismissed the defendants' counterclaim. Both sides appeal and raise issues.

## II.

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness as to the trial court's factual determinations that we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Our *de novo* review of the trial court's conclusions of law is not burdened with a presumption of correctness. *Id*.

## III.

The interpretation of a contract is a matter of law. *Rapp Const. Co. v. Jay Realty Co.*, 809 S.W.2d 490, 491 (Tenn. Ct. App. 1991) (citation omitted). When a court construes a contract, it looks to the parties' intention as expressed in the words used by the parties. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). Those words should be given their usual and ordinary meaning. *Id*. "[T]he circumstances in which the words are used is [sic] always relevant, and usually indispensable." *Higgins v. Oil, Chem. & Atomic Workers Int'l Union*, 811 S.W.2d 875, 879 (Tenn. 1991) (quoting *New York Trust Co. v. Island Oil and Transp. Corp.*, 34 F.2d 655, 656 (2nd Cir. 1929)). "[T]he interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered." *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn. 1983) (citations omitted). A contract is ambiguous when it may be "fairly . . . understood in more ways than one." *Rogers v. First Tenn. Bank Nat'l Assoc.*, 738 S.W.2d 635,

---

[4]At one place in the record, this figure is reflected as $1,199,657.

[5]This award was subsequently increased to $2,401,728.

637 (Tenn. Ct. App. 1987) (quoting *Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-91 (Tenn. 1973)).

IV.

In our judgment, the dispositive issue on this appeal is whether the evidence preponderates against the following finding of fact by the trial court:

> [T]he original lease agreement introduced as Trial Exhibit 243-A establishes the location of the leased premises as being 15.5[4] acres improved by a sports arena, trailer, garage and parking lot facilities . . . .

We hold that the evidence does so preponderate.

V.

The trial court determined that the lease – by "clear and unambiguous" language – was for the entire 15.54 acre tract. For this reason, it did not consider[6] the evidence supporting the defendants' theory that the lease only pertains to the three buildings specifically mentioned in both the lease and the sales agreement. We hold that the trial court erred in its determination that the lease was without ambiguity. We do not understand how it can be stated that the language of the lease "clear[ly] and unambiguous[ly]" pertains to a 15.54 acre tract when that document fails to specifically refer to the 15.54 acres. On the contrary, we hold that the subject matter of the lease, on its face, is clearly ambiguous. The language of the sales agreement and the lease raise many questions. We find ambiguity in the reference to "area A"; in the specific identification of the boxing arena, the double wide trailer, and the garage; in the reservation of parking; in the highlighting of one of the tax maps in yellow; and in the failure to refer to the 15.54 acre parcel in the language of the sales agreement or the lease. Hence, we conclude that the trial court erred in failing to consider the other evidence showing the intent of the parties as to the subject matter of the lease. In our *de novo* review, we will examine all of the evidence in an attempt to ascertain the preponderance of the evidence in this case. This is our obligation in a case where the trial court fails to make a factual finding based upon all of the relevant evidence offered by the parties. *See Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

---

[6]The plaintiff contends that the trial court did consider this evidence. He points to the reference in the court's memorandum opinion in which the court, as a preamble, recites that it "considered the testimony of witnesses and parties, the evidence admitted and the record as a whole." We disagree with the plaintiff's contention. The trial court found that the language of the lease was unambiguous. If this be the case, it would be improper to consider extrinsic evidence explaining the terms of the lease. We assume, and believe, the trial court, based on its finding of no unambiguity, followed the law and did not consider the extrinsic evidence.

Our analysis of the record in the instant case reveals to us that the greater weight of the evidence favors a finding that the parties intended a lease of *only* the boxing arena, the garage, and the trailer, and *not* the entire 15.54 acre parcel of land. Turning first to the plain language of the lease, it provides that the lease addresses "certain property located in the Fourth (4th) Civil District of Sullivan County, Tennessee currently owned by National Raceways, Inc. and commonly known as 'Bristol Boxing Arena['], adjacent mobile home and adjoining '2-bay' storage building." There is no mention of the 15.54 acre parcel of land, or indeed of any particular parcel of land; instead, the lease specifically mentions the three buildings. In the sales agreement, the language selected by the parties provides that the plaintiff is leasing "the boxing arena, adjacent trailer and 2-bay garage shown as area A on Exhibit 1 attached hereto." We disagree with the plaintiff's interpretation of "A" as encompassing the entire bow-tie parcel of land. The sales agreement goes on to mention that the plaintiff has the option to extend the lease of "the boxing arena, adjacent trailer and garage." In the next paragraph of the sales agreement, which discusses parking and contains a hold harmless provision, the boxing arena, trailer, and garage are specifically mentioned three times. Again, there is no mention of the 15.54 acre parcel of land.

Furthermore, in examining how the parties operated under the lease and the sales agreement, it is clear to us that the parties only intended the lease of the three buildings. The trial testimony revealed that the defendants maintained all of the 15.54 acre parcel, with the exception of the three buildings leased to the plaintiff; that the defendants placed hospitality tents on the bow-tie parcel during NASCAR races, without objection from the plaintiff; that the defendants demolished several buildings and built others on the bow-tie parcel, without objection from the plaintiff; that various letters from the plaintiff and from his attorney, Jones, to SMI's Smith and to general manager Byrd referred to the three buildings as being leased, rather than the entire parcel of land; that the plaintiff asked the defendants for permission to expand the garage; and that the plaintiff never fenced in or otherwise marked the boundary of the bow-tie parcel. All of this evidence signifies to us that the parties contemplated the lease of the three buildings only.

While the trial testimony of the various witnesses conflicts sharply over this matter, we find that the greater weight of the testimony favors the interpretation of the lease as one involving only the three buildings. Smith, Brooks, Byrd, and Lowrance all testified that the lease was for the buildings. Smith testified with absolute certainty that he did not lease any land to the plaintiff. The plaintiff, on the other hand, relies primarily upon the yellow highlighted boundary line and his interpretation of the meaning of "area A" to support his position that the entire parcel of land was leased. We are not persuaded by this testimony. The yellow highlighted map did not surface until trial. It was the only one with highlighting offered at trial. Furthermore, the highlighting is only drawn over a black boundary line – a line to which we attach no significance. That boundary line only serves to designate the parcel of land for tax purposes; it was not drawn by the parties or their agents. Finally, we note that the plaintiff's attorney, Jones, acknowledged the obvious – that a regular lease of land includes any improvements to the land, unless such improvements are specifically excepted. There would have been no reason to specifically name the three buildings in

the lease or sketch them on Exhibit 1 if the lease had indeed been for the entire 15.54 acre parcel of land. Furthermore, there would have been no reason to reserve parking. Why would one reserve parking on property already leased to it? The question answers itself.

We understand that the trial court interpreted the language of the lease as encompassing the entire parcel of land. With all due respect to the trial court, we hold that the evidence preponderates against this finding. The preponderance of the evidence is that the language of the lease contemplates only the lease of the three buildings, since those buildings are specifically mentioned.

VII.

In view of our holding above, only one issue remains for our consideration. The defendants argue that the trial court erred in dismissing their counterclaim for an unpaid account receivable owed by the plaintiff in the amount of $175,028.46. The trial court found that this debt "arose from an agreement entered into between [the plaintiff] and [Carl R.] Moore on December 31, 1994." The plaintiff entered into evidence a release dated January 17, 1996, which was executed by Moore and states that the debt had been satisfied and was discharged. The trial court found that the release "satisfied and discharged any indebtedness owed by [the plaintiff] and/or National Raceways, Inc." and therefore held that the defendants were not entitled to a $175,028.46 judgment against the plaintiff. After reviewing the record, we cannot say that the evidence preponderates against the trial court's finding. Accordingly, we affirm the dismissal of the defendants' counterclaim.

VIII.

The judgment of the trial court is affirmed in part and reversed in part. The original complaint is hereby dismissed. Exercising our discretion, we tax the costs on appeal and at the trial level to the appellant, Robert L. "Larry" Carrier. This case is remanded for collection of the trial court's costs.

_____
CHARLES D. SUSANO, JR., JUDGE