**JIT CONCEPTS, INC., Plaintiff,**

v.

**SHELBY COUNTY HEALTHCARE CORPORATION d/b/a Regional Medical Center at Memphis, Stryker Corporation and Stryker Endoscopy, Defendants.**

No. 02–2891–DV.

United States District Court,
W.D. Tennessee,
Western Division.

Feb. 23, 2005.

John McQuiston, II, Michael R. Marshall, Stokes Bartholomew, Evans & Petree, P.A., Michael G. McLaren, Michael W. Higginbotham, Black McLaren, Jones & Ryland, P.C., Memphis, TN, for Plaintiff.

Jeff Smith, Armstrong Allen, PLLC, Mark S. Norris, Thomas W. Lewis, Armstrong Allen, PLLC, Memphis, TN, for Defendant.

## ORDER DENYING THE MOTION OF PLAINTIFF FOR PARTIAL SUMMARY JUDGMENT; DENYING THE MOTION OF DEFENDANT SHELBY COUNTY HEALTHCARE CORPORATION D/B/A REGIONAL MEDICAL CENTER AT MEMPHIS FOR SUMMARY JUDGMENT; AND GRANTING THE MOTION OF DEFENDANT STRYKER CORPORATION AND STRYKER ENDOSCOPY FOR SUMMARY JUDGMENT (DOCKET ENTRIES 58, 60, and 63)

DONALD, District Judge.

Before the Court are the motion of Plaintiff JIT Concepts, Inc. ("JIT" or "Plaintiff"), for partial summary judgment with respect to its claims against Defendant Shelby County Healthcare Corporation d/b/a Regional Medical Center at Memphis ("the Med"), the motion of the Med for summary judgment, and the motion of Defendant Stryker Corporation and Stryker Endoscopy (collectively "Stryker") for summary judgment. Both Plaintiff and the Med assert that no genuine issue of material fact exists as to whether the Med breached the contract between Plaintiff and the Med. Plaintiff and the Med each assert that they are entitled to judgment as a matter of law pursuant to Fed. R.Civ.P. 56. Stryker asserts that Plaintiff failed to establish the elements of inducement to breach a contract, and therefore, no genuine issue of material fact exists as to Plaintiff's claims against Stryker. The Court has jurisdiction pursuant 28 U.S.C. § 1332. For the following reasons, the Court denies both Plaintiff's motion for partial summary judgment and the Med's motion for summary judgment. The Court, however, grants Stryker's motion for summary judgment.

## I. FACTUAL BACKGROUND[1]

In 1996 or 1997, JIT began providing bronchoscope services for the Med. In December 1999, the Med and Plaintiff entered into a contract whereby Plaintiff would provide endoscopic equipment and technical support to the Med from January 1, 2000, through December 31, 2004. Jack Coenen ("Coenen"), President of JIT, drafted the contract and the Med drafted an addendum to the contract, both of which the parties signed. The *contract* provided in pertinent part that "JIT shall rectify, within 60 days, any problems/concerns for the HOSPITAL [the Med] upon receipt of written notice of said concern."

In 2001, Dr. Timothy Fabian ("Dr.Fabian"), the Chairman of the Department of Surgery at the University of Tennessee, began considering how to make the University of Tennessee Medical school, the MED, and Methodist Hospital a nationally recognized center for minimally invasive surgery ("MIS"). To develop an MIS center at the Med, Dr. Fabian visited other hospitals that had "sophisticated" MIS centers. In addition, Dr. Fabian recruited faculty to aid in the development of the MIS center. Linda Duncan ("Duncan"), the Director of Surgical Services at the Med, knew of Dr. Fabian's efforts to develop a recognized MIS center.

In or about November or December 2001, representatives of the Med, including Duncan; Susan Raburn ("Raburn"), Nurse Manager of Operating Rooms at the Med; and Robert Poore ("Poore"), Former Di-

1. The following facts are taken from the memoranda and exhibits of Plaintiff, the Med, and Stryker in support of their respective motions for summary judgment. The facts are considered true solely for purposes of the instant order.

rector of Resources and Materials Management at the Med, met with Coenen and Tom Hink ("Hink"), the former JIT Clinical Manager. Among the issues discussed at the meeting were concerns the physicians at the Med had regarding the timeliness of responses from Plaintiff's service technicians, as well as complaints that the Med staff had about equipment malfunction and availability. In addition, Poore made statements to the effect that the financial terms of the JIT/Med contract were disadvantageous to the Med.

After the December 2001 meeting, Coenan told Marilyn Rucker ("Rucker"), JIT's site manager at the Med, of the complaints/concerns expressed by the Med staff members at the meeting. In response, Rucker met with JIT technicians who worked at the Med and took steps to ensure that the equipment complied with the needs of the Med staff.

During 2001, Hollie Cardosi ("Cardosi"), the former Stryker Endoscopy[2] sales representative for the Memphis area told Larry Filippini ("Filippini"), the Director of Sales for Stryker, that she had called on someone at the Med to discuss Stryker potentially providing endoscopic equipment and services for the Med. Stryker, like JIT, was a supplier of endoscopic equipment and services. Stryker, however, unlike JIT, actually manufactured some of the equipment it sells to hospitals. Cardosi knew that the Med had a contract with JIT to provide endoscopic equipment and services. Cardosi had heard from persons not affiliated with the Med that the Med might be interested in changing its endoscopic equipment and service supplier.

Despite Filippini's recollection that Cardosi had contacted someone from the Med in 2001, Cardosi recalls that she did not speak with someone actually associated with the Med until January or February 2002. Cardosi first contacted Dr. Fabian to discuss the products and services that Stryker could offer the Med. When Dr. Fabian spoke with Cardosi, he directed her to speak with other doctors who were on staff at the Med, such as Drs. George Wood, Elizabeth Pritchard, and Martin Croce. Cardosi attested that these doctors, as well as other employees of the Med, told her that they were not satisfied with the equipment provided by JIT because the equipment was causing patient safety issues. Among the reasons they gave Cardosi for their dissatisfaction with JIT was that the laparoscopic equipment provided by JIT did not allow the doctors to see what they were doing during surgery, resulting in doctors having to resort to general incision surgeries after starting a laparoscopic surgery. Stryker knew that the Med could terminate the contract between JIT and the Med before the expiration date if the Med determined that termination was warranted due to patient safety concerns.

In or about March 2002, Stryker submitted a proposal to the Med for the design, construction, and installation of an endosuite, a suite in effect designed for laparoscopic procedures. In April 2002, Dr. Fabian visited Ohio State University in order to inspect the endosuite previously installed by Stryker at that facility. Cardosi and other Stryker employees were present during the visit. Dr. Fabian also visited Emory University during this same time to inspect its endoscopic equipment, which was sold to Emory by Storz, Stryker's chief competitor. On April 10, 2002, Dr. Fabian wrote Cardosi a letter which provided in pertinent part:

> As you are aware, the Department of Surgery at the University of Tennessee Health Science Center is in the process

---

**2.** Stryker Endoscopy is a division of Stryker Corporation.

of establishing a Center of Excellence for minimally invasive surgery.... We intend this to be a regional referral center for clinical care as well as a national training center for fellows in minimally invasive surgery and practicing surgeons learning advanced techniques. We will begin the program by establishing one (and possibly two) state-of-the-art operating suites.... Representatives from UTHSC and [the Med] have recently evaluated Storz and Stryker laparoscopy suites and we are impressed by both systems. At this time, it appears that both systems could meet most of our needs.... We are actively seeking partnerships with industry to support these academic missions. The decision upon which system will be purchased will be made on the following considerations:

1. Capital investment of the OR suite.
2. Service and support of the system.
3. Partnership and support for teaching and research....

I would appreciate it if you would share this letter with the appropriate individuals in your company and I look forward to hearing from you soon. We would like to purchase equipment by July 1, 2002, as the capital budget is currently being prepared for that time. We would like to have the decisions for purchase made within the next month.

On May 8, 2002, Stryker made a Power-Point presentation to employees and physicians at the Med. On the same day, Storz also made a presentation to the Med. Stryker next submitted a proposal to the Med, which included four components: 1) endoscopic equipment manufactured by Stryker Endoscopy; 2) endoscopic equipment manufactured by companies other than Stryker; 3) an endosuite; and 4) technical support services that would be provided through Stryker employees who would work on site at the Med. In or about June 2002, Cardosi and other Stryker employees met with Dr. Fabian again. At that meeting, Stryker became aware that Dr. Fabian had recruited Dr. Atul Madan ("Dr.Madan"), who specialized in bariatric endoscopic surgery, to come to work at the Med and Methodist. Because Stryker believed that Dr. Madan would have some influence on whether the Med would use Stryker or Storz, Filippini and John Yoste, the Regional Sales Manager for Stryker Endoscopy, traveled to Chicago to meet with Dr. Madan. Dr. Madan started at the Med on July 1, 2002.

Sometime in June 2002, Duncan sent a letter to Rucker which related to complaints that Dr. Bob Yates had concerning the endoscopic equipment provided by JIT. Specifically, the letter discussed Dr. Yates' complaints regarding an endoscopic procedure that he had performed on June 19, 2002. Dr. Yates complained that the laparoscopic cameras were cloudy and that Plaintiff's service technicians were delayed in responding to Dr. Yates' concerns regarding the equipment. Rucker attested that she addressed all of the concerns raised in Duncan's June 20, 2002 letter. On July 16, 2002, Duncan sent Rucker a second letter related to a letter Duncan had received from Dr. Madan. In the letter, Dr. Madan expressed his concern about the service being provided by Plaintiff and the level of education its employees had regarding laparoscopic procedures. In response to Duncan and Dr. Madan's letters, Rucker tried to schedule a meeting with Dr. Madan to address his concerns. Dr. Madan, however, allegedly refused to attend any of the meetings that Rucker scheduled to address his concerns.

In August 2002, the Med requested a proposal from Stryker for a fee-per-case cost for the number of endoscopic procedures actually performed by the Med. To calculate the cost per case, Stryker used a

document provided by Poore which included the number of endoscopic cases the Med had performed from June 2000 through June, 2002.[3] Sometime in mid 2002, Dr. Madan created a price comparison of JIT and Stryker's costs. Stryker asserts that it was not aware of how much JIT made or its costs under the contract between JIT and the Med. In early October 2002, the Med and Stryker executed a contract whereby Stryker would provide endoscopic equipment and services to the Med. On October 21, 2002, the Med wrote Plaintiff a letter terminating the contract between the Med and JIT effective November 21, 2002. The letter stated in part that "due to continued patient safety issues, decreasing levels of service, and faulty and substandard equipment, among other concerns, the Med must terminate JIT's services." Upon receipt of the letter, Plaintiff sent the Med a letter requesting a sixty (60) day period in which to cure any problems that the Med had. The Med did not respond to Plaintiff's letter.

On November 20, 2002, Plaintiff initiated the instant action against the Med asserting a claim for breach of contract. Plaintiff later added Stryker Endoscopy and Stryker Corporation as additional Defendants. Plaintiff amended the complaint to include claims against the Stryker Defendants for statutory intentional interference with a contract and common law intentional interference with a contract. Plaintiff additionally added a claim against all Defendants for civil conspiracy. Thereafter, all of the parties filed motions for summary judgment as to all the substantive claims.

## II. LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56. In other words, summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* As such, summary judgment is appropriately granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In evaluating a motion for summary judgment, all the evidence and facts must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Wade v. Knoxville Utilities Bd.,* 259 F.3d 452, 460 (6th Cir.2001). Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348.

## III. ANALYSIS

Defendants assert that all of Plaintiff's claims should be summarily adjudicated.

---

**3.** JIT's contract with the Med was based on a fee per case.

Plaintiff argues that its claim for breach of contract should be summarily adjudicated because no genuine issue of material fact exists as to whether the Med breached the contract. A determination of whether Stryker is entitled to summary judgment of Plaintiff's claims for intentional interference with a contract hinges in part on whether Plaintiff may maintain its claim for breach of contract. Likewise, Plaintiff's claim for civil conspiracy depends on whether Plaintiff has asserted a claim of inducement to breach of contract. The Court, therefore, will address each claim individually.

## A. Breach of Contract

The Med contends that Plaintiff has not established a claim for breach of contract because Plaintiff cannot prove that it rectified the problems with its equipment and services within sixty days of receiving either the June 20, 2002 letter or the July 11, 2002 letter. Defendant additionally asserts that Plaintiff cannot demonstrate that the contract was unambiguous as to the method in which it could be terminated. Plaintiff argues that the Med breached the contract because it 1) failed to provide Plaintiff with any written notice pursuant to the contractual provisions, and/or 2) failed to allow JIT sixty days to cure any problems.

The interpretation of a contract is a matter of law. *Carrier v. Speedway Motorsports, Inc.*, 151 S.W.3d 920, 928 (Tenn. Ct.App.2004) (citing *Rapp Const. Co. v. Jay Realty Co.*, 809 S.W.2d 490, 491 (Tenn. Ct.App.1991)). When a court construes a contract, it should look to the parties' intention as expressed in the words used by the parties. *Id.* at 928–29 (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975)). The words of the contract should be given their usual and ordinary meaning. *Id.* at 929.

General principles of contract law require that when "the language of a contract is unambiguous, the parties' intent is discerned from the four corners of the contract." *State v. Sudderth,* 152 S.W.3d 24, 44 (Tenn.Crim.App.2004). Furthermore, "[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Id.* (quoting *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990)). A contract is ambiguous when it may be "fairly ... understood in more ways than one." *Carrier,* 151 S.W.3d at 929 (quoting *Rogers v. First Tenn. Bank Nat'l Assoc.,* 738 S.W.2d 635, 637 (Tenn.Ct.App.1987)). Courts must construe ambiguities against the drafter of a contract. *Diversified Energy, Inc. v. Tennessee Valley Authority,* 223 F.3d 328, 339 (6th Cir.2000).

The contract at issue in the instant case provides in pertinent part that "JIT shall rectify, within 60 days, any problems/concerns for the HOSPITAL [the Med] upon receipt of written notice of said concern." The language of the contract, therefore, required the Med to notify Plaintiff in writing of any problems or concerns that arose. The language further clearly provided that Plaintiff had to remedy those problems within sixty days of receiving the written notice.

The controversy that arises with the contract between Plaintiff and the Med is that the contract does not clarify 1) to whom the Med was required to provide written notice, 2) what form the notice had to take, and 3) how the Med was to proceed if Plaintiff failed to rectify the problem. Plaintiff drafted the relevant portion of the contract. As such, any ambiguities that arise from this provision must be construed against Plaintiff.

■ The Med established that it provided Rucker, JIT's site manager at the Med, with two written notifications of problems and concerns that it had with respect to the services and equipment provided by JIT. The first written notification Plaintiff received was given to Rucker by Duncan and indicated that Dr. Wood had complained of problems with equipment and technician services. The first notification, however, did not have a date on it other than the date of the incident at issue in the letter. The second written notification that Rucker received related to complaints that Dr. Madan had concerning the equipment and services provided by JIT. The notification was dated July 11, 2002. The Court finds that the second written notification that Rucker received was sufficient to satisfy the requirement of the contract that the Med provide JIT with written notification of any problems or complaints that it had. As such, JIT, per the contract, had sixty days from receipt of the letter, approximately until September 11, 2002, to rectify the problems that were raised by Dr. Madan and Duncan. Thereafter, pursuant to the contract, if JIT did not rectify the problems, the Med was entitled to terminate the contract. Thus, assuming that Plaintiff failed to rectify the problems raised by the Med, the Med did not breach the contract.

As summarized in the facts above, Rucker attested that she attempted to and did rectify any problem of which she was apprized. Steps that Rucker asserts that she took to rectify the problems included speaking with JIT technicians and terminating technicians, changing equipment, ordering equipment specified by the Med staff, and scheduling meetings with both the Med staff and equipment providers and/or herself. The Med contends, however, that JIT failed to rectify the problems within the sixty day time period. The Court finds, therefore, that a genuine issue of material fact exists as to whether JIT complied with the terms of the contract. Accordingly, the Court denies both the motion of the Med and Plaintiff for summary judgment as to Plaintiff's claim for breach of contract.

### B. Intentional Interference With A Contract

■ Having determined that Plaintiff may maintain its claim for breach of contract, the Court now considers whether Stryker is entitled to summary judgment of Plaintiff's claims for intentional interference with a contract.[4] Stryker asserts that Plaintiff cannot establish that it had the requisite intent to induce the Med to breach the contract with JIT.

■ Section 47–50–109 of the Tennessee Code Annotated codifies the Tennessee common law claim for inducement to breach a contract, except to the extent that the statute permits an award of treble damages. *Atchley v. RK Co.*, 224 F.3d 537, 540 (6th Cir.2000) (citing *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 158 (Tenn.Ct.App.1997)). Section 47–50–109 of the Tennessee Code Annotated provides:

It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to

---

4. The complaint asserts statutory and common law claims for intentional interference with a contract. Common law intentional interference with a contract has been codified pursuant to Tenn.Code Ann. § 47–50–109. *Atchley v. RK Co.*, 224 F.3d 537, 540 (6th Cir.2000). Both common law and statutory intentional interference with a contract are also referred to as procurement of breach of contract and/or inducement to breach a contract. *See, e.g., Smith v. Rosenthal Collins Group, LLC,* 340 F.Supp.2d 860, 864 (W.D.Tenn.2004) (referring to statutory intentional interference with a contract under Tenn.Code Ann. § 47–50–109 as statutory procurement of breach of contract).

perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn.Code Ann. § 47–50–109. Thus, to establish either a claim for common law or statutory inducement to breach a contract, a party must establish that (1) a legal contract existed; (2) the defendant was aware of the contract; (3) the defendant intended to induce a breach of contract; (4) the defendant acted with malice; (5) a breach of the contract occurred; (6) the breach was a proximate result of the defendant's conduct; and (7) the breach injured the plaintiff. *Givens v. Mullikin,* 75 S.W.3d 383, 405 (Tenn.2002). With respect to the third element of intentional interference with a contract, "[t]he required state of mind ... is 'the intent to cause the result,' *i.e.,* the breach." *Ameri-Gas Propane, Inc. v. J.T. Crook,* 844 F.Supp. 379, 389 (M.D.Tenn.1993) (quoting Restatement (Second) of Torts § 766 cmt. h (1979)). "[A] defendant acts intentionally when he desires the act to cause the breach or when he is substantially certain that his acts will result in a breach." Stephen W. Feldman, *Tortious Interference with Contract in Tennessee: A Practitioner's Guide,* 31 U. Mem. L.Rev. 281, 301 (2001).

■ Stryker argues that Plaintiff cannot establish that it intended to induce a breach of contract because Plaintiff cannot show that Stryker was aware, or substantially certain, that the Med was breaching its contract with JIT. More specifically, Stryker asserts that it knew of the contract and it knew that the Med could terminate the contract based on patient safety concerns. Stryker contends that given

that its representatives were told by various staff members of the Med about concerns and problems that they had with JIT equipment and service, Stryker could not have intended to induce a breach of contract between the Med and JIT. Moreover, Stryker asserts that its belief that the Med's patient safety concerns were legitimate was verified when 1) it was told that "legal" was considering whether it could terminate the contract between JIT and the Med, and 2) the Med then entered into an agreement with Stryker. In sum, Stryker contends that it had no reason to doubt the reasons given by the Med for wanting to terminate the contract with JIT or that the Med could do so if it was determined by the Med's legal department that the Med could terminate the contract.

In *Wells Fund I v. The Shoe Show of Rocky Mount, Inc.,* 863 S.W.2d 731 (Tenn. Ct.App.1993), the court considered whether a lessor had induced a breach of contract between a lessee and its landlord. In determining that the lessor was liable for inducement to breach, the court held that "where a party knows of a lease [contract], as [the lessor or alleged inducer] in the present case undoubtedly did, he is on notice as to the terms of the agreement and has a duty to learn whether his actions will cause the lessee to breach his agreement." *Wells Fund I,* 863 S.W.2d at 733. The court further stated that the alleged inducer "may not close its eyes and ears and thereafter claim a lack of knowledge when the lease [contract] could have been easily obtained from [the plaintiff]." *Id.* at 733–34. Likewise, in *Prime Company v. Wilkinson & Snowden, Inc.,* 2004 WL 2218574 (Tenn.Ct.App.2004), the successor real estate company knew of the contract between the seller and the previous real estate agent and would have known that the contract between the seller and the previous real estate agent would be

breached if it had inquired into the terms of the contract between them.[5]

In both *Prime Company* and *Wells Fund I*, had the defendants made a simple inquiry into the terms of the contract, they would have determined that its new customers would be breaching an existing contract. In the instant case, the record indicates that Stryker, namely Cardosi, contacted the Med after hearing that the Med was dissatisfied with JIT's services and that it may be interested in changing suppliers after the contract expired. When Cardosi contacted Dr. Fabian, a Med staff member, she was aware that a contract existed between Plaintiff and the Med. Stryker knew that the Med could terminate the contract between it and JIT under certain circumstances, namely if patient safety concerns warranted termination of the contract. Dr. Fabian directed Cardosi to contact other staff members. These staff members expressed their concerns to Cardosi about the equipment and services JIT provided, indicating that they were concerned about the safety of its patients. Plaintiff disputes that the Med's staff was concerned about patient safety or displeased with the equipment and services provided by JIT. Plaintiff has not provided any evidence, however, to dispute that Stryker was told by the Med's staff that they were dissatisfied with JIT's equipment and services. Plaintiff also does not offer evidence that rebuts Stryker's assertion that it believed that the Med was concerned about the safety of patients and could terminate the contract if it believed that patient safety was an issue. Moreover, Plaintiff does not dispute that Stryker employees were told that the Med's legal department had to determine whether the Med could terminate the contract between JIT and the Med. Thus, unlike the facts in *Prime Company* and *Wells Fund I*, had Stryker made an inquiry into the terms of the contract, it would not have known that the Med would be breaching the contract with JIT. In sum, as Stryker argues, in order to know whether the Med would be breaching the contract, Stryker would have had to second guess the Med's lawyers and conduct its own investigation of patient safety concerns raised by the Med. Under these circumstances, the Court finds that Plaintiff has failed to provide evidence establishing that Stryker intended to induce the Med to breach its contract with JIT. Accordingly, the Court grants Stryker's mo-

---

5. In *Prime Company v. Wilkinson & Snowden, Inc.*, 2004 WL 2218574 (Tenn.Ct.App.2004), the court considered whether the trial court properly dismissed the plaintiff's claim of procurement of breach of contract. *Prime Company*, 2004 WL 2218574, at * 1. When considering whether the plaintiff in that case established that the defendant acted maliciously, the court relied on *Crye–Leike Realtors, Inc. v. WDM, Inc.*, 1998 WL 651623 (Tenn.Ct.App.1998). *Id.* at *4. In *Crye–Leike Relators, Inc.*, the court determined that to show malice it was sufficient if the evidence showed that the defendant's "conduct was intentional and without legal justification. . . . Interference is without justification if it 'is done for the indirect purpose of injuring the plaintiff or benefitting the defendant at the plaintiff's expense.' " *Id.* (quoting *Crye–Leike Realtors, Inc.*, 1998 WL 651623, at *6.). The

*Crye–Leike Realtors, Inc.* Court concluded that the defendant knew of the contract between the plaintiff and the other defendant, "but did not inquire into the extent and the nature of the relationship. Rather, [the defendant] proceeded to conclude the lease transaction, without regard for [the plaintiff]." *Id.* (citing *Crye–Leike Realtors, Inc.*, 1998 WL 651623, at *6). The *Crye–Leike* Court determined that the plaintiff had provided evidence of malice, or the "willful violation of a known right," sufficient to defeat the defendant's motion for summary judgment. *Id.* (quoting *Crye–Leike Realtors, Inc.*, 1998 WL 651623, at *6). Applying the reasoning in *Crye–Leike Realtors, Inc.*, the *Prime Company* Court concluded that the trial court applied the wrong definition of malice when it dismissed the plaintiff's claim for procurement to breach of contract. *Id.*

tion for summary judgment as to Plaintiff's claims for intentional interference with a contract.

### C. Conspiracy to Cause a Breach of Contract

■ Stryker asserts that Plaintiff's claim of civil conspiracy should be summarily adjudicated because Plaintiff has not established a claim of inducement to breach a contract. A civil conspiracy is defined as "a combination between two or more person to accomplish by concert an unlawful purpose or to accomplish a purpose not in itself unlawful by unlawful means." *Akins v. ICI Americas Inc.*, 1993 WL 832408, at * 18 (M.D.Tenn.1993). To prevail on a claim for civil conspiracy based on inducement to breach a contract, the plaintiff must establish a claim for inducement to breach a contract. *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994). As discussed *supra,* the Court has determined that Plaintiff has failed to establish a claim of inducement to breach a contract. Accordingly, the Court grants Stryker's motion for summary judgment as to Plaintiff's claim of civil conspiracy.

### IV. CONCLUSION

Based on the foregoing, the Court denies the motions of JIT and the Med for summary judgment. The Court, however, grants the motion of Stryker for summary judgment.

**IT IS SO ORDERED** this _____ day of February, 2005.