IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 28, 2003 Session

## STATE OF TENNESSEE v. REGINALD STACY SUDDERTH

**Direct Appeal from the Criminal Court for Knox County**
**No. 74386    James L. Weatherford, Judge, By Designation**

---

**No. E2003-00333-CCA-R9-CD - Filed May 18, 2004**

---

In 1998, the defendant, through former counsel, entered into a letter agreement with the Blount County District Attorney General which provided that he would be granted immunity for the murder of Andre Jackson if he provided information and cooperated in the prosecution of the murder of Gary Huskey and passed a polygraph examination administered by the Federal Bureau of Investigation ("FBI") as to the Huskey murder. The defendant subsequently was indicted for first degree murder and conspiracy to commit first degree murder. He then filed a motion to dismiss the indictment, claiming, *inter alia*, that the polygraph was unfair, that he had not failed the test, and that the State breached its agreement to provide another polygraph. Following hearings, the trial court denied the motion, and the defendant filed an interlocutory appeal. After review, we affirm the judgment of the trial court denying the motion, but remand for entry of corrected minutes reflecting that the trial court denied the defendant's motion to dismiss.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court Affirmed and Remanded**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Herbert S. Moncier, Knoxville, Tennessee, for the appellant, Reginald Stacy Sudderth.

Paul G. Summers, Attorney General and Reporter; Joseph F. Whalen, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Joseph E. Perrin and Barry Staubus, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The sole issue presented by this appeal is whether the trial court erred in concluding that the State did not breach an immunity agreement which it had entered into with the defendant, thus allowing the State to proceed in the indictment that is the basis for this appeal. In making our determination, we first will review the chronology of the matter.

On April 7, 1998, Andre Jackson was murdered in Blount County, Tennessee. Through an attorney then representing him, the defendant entered into a letter agreement on April 9, 1998, with Michael Flynn, the Blount County District Attorney General, which recited that:

> In exchange for complete and full immunity for [the defendant] for any charges related to the death of Andre Jackson, [the defendant] will do the following:
>
> 1. Provide all information he has regarding the death of Gary Huskey, and cooperate in the prosecution of those charged with his slaying, including submitting to a polygraph and testifying truthfully in Court with regard to these matters.
>
> 2. Testify truthfully and consistently with the statement submitted to the Blount County Sheriff's Department with regard to the shooting of A.C. Copeland by David Brown.
>
> It is also our agreement that the polygraph examination will be administered by the FBI and that if [the defendant] does not pass the polygraph examination, he will not be afforded the immunity referred to in paragraph one.

Although the technical record does not contain a copy of the defendant's motion to dismiss the indictment because of the alleged breach of the immunity agreement by the State, the appendix to his brief includes such a motion, designated as Defense Motion No. 1000, bearing the clerk's stamped date of July 9, 2001. The trial court's minutes of January 7, 2003, contained in the technical record and referring to this motion, recite that "the Court having considered and well understood the [Motion to Dismiss for Breach of Agreement of Immunity], said Motion is GRANTED." The minutes conflict with the trial court's oral ruling following the hearing, the court denying the motion, which resulted in this appeal.

On March 5, 2002, November 25, 2002, December 30, 2002, and January 7, 2003, the trial court conducted hearings on the defendant's motion to dismiss the indictment. At the March 5 hearing, the State announced to the court that former FBI Agent Arthur G. Richards, Jr., who had administered the polygraph to the defendant, had reviewed and rescored his charts earlier that morning "and found that actually the scores . . . fell into an inconclusive category, as opposed to a deception category." The State then explained that the parties intended to arrange another polygraph by the FBI since the results of the defendant's first polygraph were "inconclusive." However, as we will explain subsequently, the FBI refused to retest the defendant, and the trial court continued to hold hearings on the motion.

The State's witness at the January 7, 2003, hearing, when the court heard testimony on the motion, was Arthur G. Richards, Jr., who had retired from the FBI in October 1998 and was then working as a private investigator and polygraph examiner. He said that he had administered a polygraph examination to the defendant on April 15, 1998, while still employed by the FBI. He questioned the defendant as to his knowledge of the murder of Gary Huskey and, during the examination, asked the "relevant" questions, "Did you hear A.C. – he smoked that white boy?" and "Did you see A.C. and Chris in the vicinity of Jackson Hills a few days prior to the incident?" As to the results of the polygraph, Richards explained that, although the charts "scored inconclusive," he scored the test as deceptive:

> Now, when he was confronted with the results, and I don't remember whether I told him that he failed the test, I don't remember whether I told him that he had problems with the test, which are two phrases that I sometimes use after a person does not successfully complete a test, or if I asked him for his explanation of why he didn't do well on the test.
>
> He told me that he did not remember the specific phraseology. Now – and that the statement that he smoked that white boy, he says that just from the totality of what . . . A.C. Copeland told him, he had the impression that . . . he killed him.
>
> Now, before I asked him that question on the . . . polygraph examination, when I was in the process of reviewing the questions, I told him because he had . . . admitted before the actual test that he didn't remember the exact questions or the exact statement that A.C. made, and I told him, I said, "Well, look, polygraph is not designed for intent-type questions and it's not designed for 'do you believe' and that sort of thing." I said, "Did he say it or not?" And he said, "Yes, he said it." He said . . . "A.C. said he smoked that white boy." So I said okay.
>
> And that's what I asked him on the polygraph examination, and then when he was confronted in the fact he did not pass the test, he said that, "Well, I don't remember the exact phraseology, but it was my impression that . . . he was admitting to the murder."

Richards explained that he had scored the defendant's responses as "deceptive" because of "the FBI's administrative rules with regard to a person changing their statement." As to the defendant's actual score itself, Richards said that it was "inconclusive," meaning that "he did not pass" the polygraph test.

-3-

On cross-examination, Richards said that the actual scores given to the defendant on the polygraph were "zero plus two or zero plus one . . . and plus one, plus two." He agreed with defense counsel's statement that an inconclusive test result occurred when the test questions did not properly identify the relevant issue and that following such a result, the subject often is retested. He said that the FBI policy was that if the test results showed "deception," the subject would not be retested, but a retest would occur if the results were inconclusive. He was not asked to retest the defendant. He said that he "probably" scored the results as deceptive, rather than inconclusive, because of FBI policy.

The first defense witness at the hearing was the attorney who had represented the defendant at the time the immunity agreement was entered into, which occurred on April 9, 1998, with the Blount County District Attorney General. He said that he had accompanied the defendant to the polygraph examination and was told by Detective James Widener of the Blount County Sheriff's Department that they intended to question the defendant about the death of Andre Jackson, which surprised him. Counsel believed that the questioning was to be "[a]bout Gary Husk[e]y and what [the defendant] knew about statements made about Gary Husk[e]y's death." They then telephoned the District Attorney General who had executed the agreement, who confirmed it was expected the defendant would be questioned only about the death of Gary Huskey. Counsel explained this to the defendant, who left with Agent Richards for the polygraph examination. About an hour later, the defendant telephoned and told him that he was being asked "about everything under the sun," including whether he was a drug dealer, what he knew about drugs, about "what happened with Andre Jackson," and other matters. Counsel then spoke again with Agent Richards, who agreed to limit questioning to the death of Gary Huskey. Afterwards, he talked with the defendant, who told him that it had been a "setup" and that "because of the – something about the irregularity of it or the inconclusiveness of it, . . . another [polygraph examination] would be scheduled." Counsel said that he later received a telephone call from the District Attorney General's office and was told that another polygraph test would not be given to the defendant because "he had already had a polygraph."

James L. Widener testified that he was a detective and a polygraph examiner with the Blount County Sheriff's Department. He said that if an inconclusive result occurred on a polygraph that he gave, he would administer another examination, but not on the same day. He said that an inconclusive result was not the same as passing the test.

William Manuel testified that he was a detective with the Blount County Sheriff's Department. He denied that Chris Knighton was not being charged with the murder of Gary Huskey until the defendant had been prosecuted.

The defendant testified that he did not hesitate to take the polygraph, but he "didn't trust" the FBI. When he arrived to take the polygraph and saw that Blount County detectives were present, he thought it was a "setup." He said he thought the polygraph was to be about the killing of Gary Huskey, but Agent Richards had asked about "who was active in the neighborhood selling drugs."

-4-

Daniel E. Sosnowski testified that he was a polygraph examiner and consultant and director of a polygraph school in Fort Lauderdale, Florida. He said that he had graded the results of the defendant's polygraph examination and that the defendant had passed. He explained that the test given the defendant was a "bi-zone exam" and, on such a test where two different issues were asked about, it was "not a fair examination." He expected the result of such questioning to be inconclusive. He said that an examination should not be given to a subject who was angry at the examiner, and, if this were the case, the test should be rescheduled. In his opinion, the polygraph examination administered to the defendant "was not fairly conducted according to the standards of the American Polygraph Association."

Recalled to testify, Agent Richards said that the defendant had not appeared to be angry when the test was administered. The defendant was allowed to telephone his attorney because he said he was "concerned" about answering questions regarding the murder of Andre Jackson. On cross-examination, Richards said that the American Polygraph Association Standards were different from those followed by the FBI.

At the conclusion of the hearing, the trial court ruled that the letter agreement could not be enforced by the defendant because he did not pass the polygraph examination:

> Now, since this matter first came up when we were here back in March, I've had this Howington case and also a case that came out just not long after it did that mentioned it, that State v. Jacobs, and you know, there's not a lot of cases about immunity. You'll agree to that. And I've been concerned about this matter.
>
> When we were here, I believe in March of last year, I was under the impression that [the defendant] was going to be given another test by the FBI just like stated in this agreement, and as I understood sometime after that the FBI said that they would not do this. . . .
>
> Of course, at that time Mr. Richards was retired from the FBI, and he could not do it because at that point it wouldn't have been given by the FBI, and there were just some set of circumstances that I guess – well, certainly nothing can be done about them now, but . . . I've listened, I've read these cases, and I've studied about this matter, because we've been here about, what, three or four times – three times at least when the matter was not heard, no proof was presented. So that's plenty of time to consider this, and I understand that the initial burden is on the defendant to show this immunity agreement, which is an exhibit, and there's not any doubt about that agreement was entered into. And I understand that after that is shown that the state must show beyond a reasonable doubt why the agreement is invalid or why prosecution should be allowed.

Now, I've heard from some interesting witnesses today – Mr. Richards and [the defendant's previous attorney] and Mr. Widener, Mr. Manuel, the detective, [the defendant], Mr. Sosnowski – and listened very carefully to all of them. But going back to this agreement that was entered into subject to this particular hearing, I am satisfied beyond a reasonable doubt that the agreement is invalid, because I cannot say that [the defendant] did not – because [the defendant] did not pass this polygraph examination.

Now, I'm not unmindful of Mr. Sosnowski's testimony. When he said he did pass it, he scored a four or a five, and Mr. Richards said that it was not passed, and at most he could say it was inconclusive. But from the totality of the evidence that's been submitted here today, I just don't feel like beyond a reasonable doubt – and that's a heavy burden, but I just don't feel that [the defendant] passed his polygraph examination administered by the FBI.

It is this ruling of the trial court which the defendant appeals.

## ANALYSIS

In our review, we will consider the defendant's five arguments which, although stated using several different approaches in his briefs, are the basis for his various claims: (1) the State failed to prove that the defendant's "passing the polygraph test [was] a material condition of the immunity agreement;" (2) the defendant "passed" the polygraph test; (3) the FBI administered a "defective and unreliable polygraph on April 15, 1998;" (4) the trial court should have ruled on the motion to dismiss at the November 25, 2002, hearing; and (5) the State breached its March 5, 2002, agreement to have the defendant retested "by the FBI or another polygrapher."

Because it is the basis for several of the defendant's arguments on appeal, we first will review what we have listed above as claim (5), that at the hearing on March 5, 2002, after learning that the 1998 polygraph results were inconclusive, "the State and defense amended the agreement to provide [the defendant] would be given another polygraph by the FBI or another polygrapher." In fact, the hearing transcript contained in the record on appeal does reflect that the District Attorney General proposed that another polygraph be given to the defendant but that it be done not by "the FBI or another polygrapher," as the defendant claims, but instead by "the FBI by another FBI polygrapher:"

As a consequence of all of this, Mr. Moncier and I have agreed that it would be proper in connection with the immunity agreement that was entered into previously to have [the defendant] reexamined by the FBI by another **FBI polygrapher** to determine whether or not

he could pass the polygraph on this information, and I guess that kind
of puts this motion on hold at this point, Judge. (emphasis added).

Based upon his version of the statement of the District Attorney General, the defendant argues on appeal that the State breached its March 5, 2002, agreement for a retesting by refusing to allow a private polygrapher to administer a second test, after the FBI had refused to do so and that, as a result of this refusal, the State is estopped from withholding the grant of immunity based on the results of the defendant's first test. However, these claims, and their variants, are based upon a misquoting of the record. In fact, the State did exactly what the court was advised would be done: Following the March 5, 2002, hearing, the State contacted the FBI and requested that another polygraph be administered to the defendant, but the FBI refused to retest the defendant. Thus, all of the defendant's arguments as to his not being retested in 2002 are dependent upon his mistaken view of the record. All of these arguments are without merit.

Before considering the defendant's remaining four claims, we first will review the relevant chronology. The Blount County District Attorney General's office and counsel then representing the defendant entered into a letter agreement on April 9, 1998, for the defendant, *inter alia*, to submit to a "polygraph examination [to] be administered by the FBI, and if [the defendant] does not pass the polygraph examination, he will not be afforded the immunity referred to in paragraph one." The agreement is silent as to what would occur if the test result was neither "pass" nor "fail" but, instead, inconclusive. The Polygraph Report dated April 21, 1998, states that "[i]t is the opinion of the examiner that the recorded responses [of the two relevant questions] are indicative of deception." On March 5, 2002, Agent Richards reviewed the results of this test and advised that if he had considered only the defendant's score and not applied the FBI policy as to a changed response, the test results would have been inconclusive, rather than deceptive. The prosecutor then advised the court that he and defense counsel had agreed that the defendant would be "reexamined by the FBI by another FBI polygrapher." However, the State's request to the FBI for a retesting of the defendant was denied, apparently because of the FBI's policy against retesting. Subsequently, the defendant filed a motion to dismiss his pending indictment.

Next, we will review the evidentiary standards applicable to the hearing. In State v. Howington, 907 S.W.2d 403, 404-05 (Tenn. 1995), our supreme court considered whether the defendant could enforce an informal immunity agreement whereby, in exchange for his truthful testimony at his preliminary hearing, the State would recommend that he be bound to the grand jury on second degree murder instead of first degree murder, with which he had been charged. Subsequently, in that testimony, the defendant inculpated himself and said his codefendant had "given" him $500 of the victim's cash, but did not volunteer that, apparently, without the knowledge of the codefendant, he had taken an additional $4,000 from the victim. Id. at 410. The State refused to honor the agreement, arguing, *inter alia*, that the defendant had "lied regarding the amount of money he received from the robbery." Id. The court determined that the immunity agreement was "contractual in nature and enforceable under the law of contracts." Id. at 408. In its ruling that the defendant could enforce the agreement, the court adopted the burden of proof explained in Zani v. State, 701 S.W.2d 249, 254 (Tex. Crim. App. 1985), whereby once the defendant initially proves by

a preponderance of the evidence the existence of an immunity agreement, "the burden then shifts to the State to show beyond a reasonable doubt why the agreement is invalid or why the prosecution should be allowed despite the agreement." Id. (footnote omitted). We now will apply this holding to the present case.

## I.  Materiality of Requirement That the Defendant Pass the Polygraph

On appeal, the defendant argues that the requirement he pass the polygraph examination was not "material" to the agreement, and, thus, there was no basis for denying immunity to him. He has provided no references to the record showing that he made this argument to the trial court and has not claimed that he did so. We note that on January 7, 2003, at the conclusion of the last hearing on his motion to dismiss, the only claim the defendant made as to "materiality," as we understand his arguments, was that the "deviation" in the FBI scoring of the polygraph was not "material to the contract," resulting in the fact, according to the defendant's argument at the hearing, that the defendant "passed the polygraph." Thus, the issue of the materiality to the agreement of the requirement that the defendant pass the polygraph was not presented to or reviewed by the trial court.

Determining in Howington whether the requirement was "material to the contract" that the defendant testify "truthfully" at the preliminary hearing, our supreme court relied upon the Restatement (Second) of Contracts § 241 which sets out considerations to be used in ascertaining whether a failure to offer or render performance is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

907 S.W.2d at 411. The court instructed that, in assessing such an agreement in a criminal case, "'the most important consideration is the incriminating nature of the proferred [sic] statements, not the amount of information provided to the government.'" Id.

The State argued that Howington had not testified truthfully and, thus, had not satisfied the condition precedent, excusing the State's performance. Noting the general preference in contract law "against finding a term to be a condition precedent," the court determined that the "actual condition" to the grant of immunity to the defendant was the State's "subjective assessment of Howington's testimony," which, it noted, was not controlled by the defendant. Id. at 409-10. Thus, the contract had no condition precedent or the condition was that "Howington testify against [a codefendant], which he did." Id. at 410. Additionally, the court explained that because of the necessity of protecting the defendant's right to due process, ambiguities in the agreement must be construed against the State. Applying these principles, the court determined that the State had failed to show that all parties understood the grant of immunity was conditional "upon the State's subjective determination that the defendant's testimony was 'truthful.'" Id.

Concluding its analysis, the court explained why the State was obligated to grant immunity to Howington:

> [T]he State enjoyed the benefit which it reasonably expected; that is, eyewitness testimony against [a codefendant]. Also, while the agreement provided no remedy for a breach, revoking the agreement certainly does nothing to compensate the State for any alleged injury, and it is decidedly unfair to do this after Howington relied on the agreement. Moreover, Howington produced exceptionally incriminating evidence, not only against [a codefendant], but also against himself. Finally, in light of Howington's complete cooperation, his answer regarding the amount of money he was given hardly indicates a lack of good faith and fair dealing on his part. Thus, we conclude that any breach which occurred under the facts was not material considering the circumstances.

Id. at 411 (footnote omitted).

We now will apply the considerations explained in Howington to ascertain the materiality of the provision that the defendant pass the polygraph. As to the extent that the State will be deprived of the benefit of the agreement if the defendant prevails in this appeal, he argues that the State benefitted because it "obtained information about the death of Gary Huskey and shooting of Mr. Brown." The problem with this view is that the State does not have any assurance the defendant's responses were truthful, as would have been the case to an extent had he passed the polygraph. Unlike the situation in Howington whereby the State made the subjective determination as to whether the defendant was being truthful, the written agreement in the present appeal explicitly and plainly required that the defendant submit to a polygraph to "be administered by the FBI and . . . if [the defendant] does not pass the polygraph examination, he will not be afforded the immunity." While the defendant did make a "statement," as he asserts, the State has no assurance that the defendant was being truthful, as apparently would have been the case if he had passed the polygraph.

Additionally, while Howington testified at the preliminary hearing incriminating himself in the crime, this defendant's statement on April 10, 1998, regarding the murder of Gary Huskey, not only does not inculpate him in the crime but, in fact, claims he was the victim of a kidnapping:

> [The defendant] states that during the abduction of he and David Brown by AC, while they were going down the road, AC was talking. AC made a threat at gunpoint that to the best of his recollection was either "You gonna give me $20,000.00 or I'll smoke you like me and Knighton smoked that white boy in Jackson Hills" or "You gonna give me $20,000.00 or I'll smoke you like we smoked that white boy in Jackson Hills.[1]

Arguing that he is entitled to immunity, the defendant asserts that he "waived his constitutional right to remain silent by giving an extensive statement to FBI Agent Richards and also giving a statement regarding A. C. Copeland." While it is true that the defendant made "statements," he does not specify their incriminating nature, and his argument ignores the principle explained in Howington that "'the most important consideration is the incriminating nature of the . . . statements, not the amount of information.'" 907 S.W.2d at 411 (quoting United States v. Fitch, 964 F.2d 571, 574 (6th Cir. 1992)).

Applying the Howington considerations, we conclude that the requirement the defendant pass the polygraph test was material to the immunity agreement, and his failure to do so justifies the State's refusal to grant immunity.

Parties to a contract may include a provision that the successful performance by one party is dependent upon the satisfaction of an independent third party, as the FBI was to this contract.[2] In Hanscom v. Gregorie, 562 A.2d 1232, 1232 (Me. 1989), relying upon the Restatement (Second) of Contracts, the court explained this principle as applied to a contract whereby the buyer of a house had made the purchase contingent upon a professional building inspector, paid by the buyer, not finding "major structural problems or defects of a substantial nature:"

> Because the inspector honestly believed that the building did not meet the condition of being free of defects of a substantial nature, the buyers' decision to terminate the contract and secure their deposit was within the terms provided in the contract. See Restatement (Second) of Contracts § 227 comment c & illustration 5, § 228 comment b (1981) (when a contract leaves a determination of the satisfaction of

[1]We note that the two "relevant questions" asked during the polygraph were based upon this statement by the defendant.

[2]Although the defendant argues to the contrary, we conclude, as we subsequently will explain, that, in administering the polygraph, the FBI was not acting as the "agent" of the State.

a condition in the hands of an independent third party, there is no breach of the contract as long as the third party is honestly satisfied that the condition has not been met).

Id. at 1233.

Although the defendant makes numerous complaints against Agent Richards and his administration and scoring of the polygraph examination, the fact remains that his testimony was the defendant did not pass the examination. While the correctness of this conclusion was disputed by Mr. Sosnowski, the trial court determined that the defendant had not passed the test, as required by the agreement before immunity would be conferred.

As for the defendant's claim that "[t]he plea agreement did not require the FBI grade the polygraph examination" and "[a]ny reliable polygraph expert could have graded the polygraph that was administered by the FBI," we note that this interpretation was not suggested by former counsel who negotiated the agreement for the defendant and, apparently, was not made until the November 25, 2002, hearing, over four years after the defendant had taken the polygraph and had changed counsel. On November 25, 2002, after the parties had determined that the FBI would not retest the defendant and were discussing witnesses to be presented on the defendant's motion to dismiss, defense counsel advised the court, "[The defendant's previous attorney] would testify that – as to the purpose of selecting the FBI, that the FBI was selected believing that it was a neutral and it would provide a reliable and scientific valid polygraph report." This claim is without merit.

## II. Defendant's Claim That He Passed the Polygraph

The immunity agreement required, as we have stated, that the defendant provide all information he had regarding the death of Gary Huskey, "including submitting to a polygraph" which was to "be administered by the FBI." If the defendant did not "pass" the polygraph, he would not be afforded immunity. This polygraph was administered and scored by then FBI Agent Richards, who testified at length at the hearing. He explained that, during the polygraph, the defendant had been asked two "relevant questions," and the test results showed deception in his responses:

> Q   Okay. Now, in the official report that you filed of this polygraph examination did you indicate whether or not in your opinion [the defendant] showed deception on those two relevant questions?
>
> A   What I indicated on the . . . polygraph was that it was a deceptive test based on the FBI's administrative rules with regard to a person changing their statement. In the FBI a person has a deceptive test if they make a pretest or a post-test admission or if they make a pretest or post-test confession. That's automatically a deceptive test.

Q   What is the reason for that policy, do you know?

A   Again, it's for keeping records on the effectiveness of polygraph in the field. I think that's probably the reason for it.

Q   Okay. The actual scores, I believe you've testified, that [the defendant] made on these questions you say are in – actually in the inconclusive range?

A   They are inconclusive.

Q   Do those scores mean that he passed the polygraph relating to his knowledge of or the truthfulness of his knowledge about the death of Gary Huskey?

A   No, he did not pass it.

Richards was questioned on cross-examination as to what had caused the results to be inconclusive and why the defendant had not been retested:

Q   Now, would you agree, sir, that when an inconclusive test result occurs that essentially there is something during the test procedure or during the formulation of the questions that have failed to identify the relevant issue to be tested? Would you agree with that statement?

A   I agree with it.

Q   And quite often when an inconclusive result comes back that person is retested. Would you agree with that?

A   Yes.

Q   It is the policy of the FBI that if a person is inconclusive that the person be re-polygraphed if they request to do so; is that correct?

A   Yes.

Q   Why was [the defendant] not retested?

A   I was never asked to retest.

Additionally, Richards explained that when a test result showed deception, the policy of the FBI was that the subject would not be retested:

Q  [I]s there a policy of the FBI that if there is a change . . . .  Is a person retested if they showed deception, by policy?

A  No.

Q  Okay.  And, of course, this test went down as showing deception; is that correct?

A  Yes.

Q  So that would block a retesting?

A  Well, if they had come back and told me that they had to have either a conclusive no deception or deception, then perhaps I would have retested him.  But what you have to understand is I was doing this as a favor to the Blount County Sheriff's Office.  They did not, at that time, have their own examiner.

Q  So the Blount County Sheriff's Department did not come back to you and ask you to retest him?

A  No, not that – no.

At the conclusion of the hearing when questioned by defense counsel as to whether the polygraph test "met accepted standards," the court found that it did:

For the FBI, yeah.  I think it did for the FBI test.  I don't think it would from one of Mr. Sosnowski's tests at all, but I'd say for the FBI, and it's been pretty well admitted and conceded that they do a little bit different, and they did here, and I'd say as far as what Mr. Richards had done and he had done a lot of it, that he did it according to something that would suit the FBI.

In his brief, the defendant relies upon Agent Richards' testimony to support his claim that the State denied him a retest in 1998, asserting that "Mr. Richards did not perform a re-test because Blount County did not request one.  Had Blount County requested a re-test, Mr. Richards would have performed a second test."  We have set out Agent Richards' response regarding a retest and respectfully disagree that the defendant has accurately summarized it.  Richards said that "perhaps" he would have retested the defendant, but reminded that he had performed the first test only as a "favor" to the sheriff's department.  Additionally, we note in this regard that it was not until March 5, 2002, when the State learned that, absent application of an FBI scoring procedure, the defendant's result would have been "inconclusive" rather than "failed."  Thus, there was no reason for the State

to request a retest in 1998 when, as far as the parties believed, the defendant had failed the polygraph based just on his raw score.

Daniel Sosnowski, the defendant's polygraph expert, testified that he believed the defendant had passed the polygraph test:

Q  Now, with regard to the charts that were provided to you of the examination of [the defendant], I believe I asked you this, but was this a – were these a two-question examination or a bi-zone?

A  Yes, it was.

Q  What would be passing under the generally accepted standards applicable to polygrapher examiners both taught by DoDPI as well as by your profession with regard to passing this particular test?

A  It would be a plus four.

Q  Did you grade the charts of [the defendant]?

A  The ones conducted by Mr. Richards, yes, I did.

Q  And what did you grade the charts as being?

A  A plus five.

Q  What did your associate grade the charts as being?

A  A plus four.

Q  In your opinion did [the defendant] pass the polygraph examination administered by the FBI?

A  Yes, he did.

Q  And is that according to the standards that are taught by the DoDPI as well as the standards that are generally applicable in the field of polygraph examinations applicable to the FBI?

A  Yes, they are.

Sosnowski said that, in his opinion, the April 15, 1998, polygraph administered to the defendant "was not fairly conducted according to the standards of the American Polygraph Association."

-14-

On cross-examination, Sosnowski was asked whether he previously had told Agent Richards that the results of the polygraph were inconclusive:

> Q   Did you tell him at that time that you had scored the charts and in your opinion the results were inconclusive?
>
> A   When . . . the score was at plus five was inconclusive until we found the documentation with a bi-zone. I personally do not conduct a bi-zone. So I don't use the cutoff scores of plus six or minus six. I would use those cutoff scores in a tri-zone. In a bi-zone the rules change.
>
> Q   You mean you didn't have the documentation of the polygraph exam at that time?
>
> A   No. I didn't have Dr. Matte's book with me at the time. No.
>
> Q   You were prepared to testify about it at that time?
>
> A   Yes, until we – I said until we found out in Dr. Matte's book what a bi-zone or bi-spot – that the rules change.
>
> A   So if you had testified back in March of 2000, your testimony would have been those charts showed the defendant's examination was inconclusive?
>
> A   Probably.

Additionally, he was asked if one of his associates had scored the defendant's test:

> Q   Sir, did I understand you to say previously in your testimony that one of your associates also scored these charts?
>
> A   Yes.
>
> Q   What was the results of his score?
>
> A   Plus four.
>
> Q   Is that passing or is that inconclusive?
>
> A   Well, it depends. If you use the rules now, plus four is passing.

Q   But if you used them as what the rules were back when this test was given, it would have been inconclusive?

A   No.  Again, we're saying the vast majority of examiners, we use a tri-zone.  That's where that plus or minus six come[s] from.  When you use a bi-zone, it goes down to a plus or minus four.  The vast majority of examiners out there do not use a bi-zone.

The defendant argues that he passed the polygraph, saying that "Mr. Sosnowski and Blount County Detective Widener testified a +4 was a passing score on a bi-spot examination such as the examination given" to the defendant.  Although, as we have said, Sosnowski testified that a +4 was a passing score on a bi-zone polygraph, we disagree with the defendant's representations as to Detective Widener's response as to a passing score on a polygraph examination.  In fact, Widener said that a passing score would be a three or a seven, depending on which scoring system was used:

Q   Sir, are you familiar with what's known as a bi-zone or a bi-spot examination where two subjects are in the same examination?

A   A bi-zone?

Q   Yes, sir.

A   Generally, it's my understanding bi-zone is with two relevant issues being examined, yes, sir.

Q   Okay.  And what is a passing score for a bi-zone, sir?

A   Sir, it's according to which scoring technique is used, either a three point or seven point.

Q   Okay.  Depends on which scoring techniques are used?

A   Yes, sir.

Q   Under one scoring technique it would be a point – point three; is that correct?

A   Plus three.

Q   Three plus.

A   Plus three or above.

Q Okay. And what technique is that?

A That's a three-point scoring system, sir.

Q Okay. And so it just depends upon what scoring system somebody might use as to when a bi – or what did you call it?

A Bi-zone.

Q Bi-zone. As to what passing would be?

A Yes, sir.

On cross-examination, Agent Richards explained in rebuttal that a "plus six" was a passing score on the polygraph which he administered to the defendant:

Q What is a passing score in terms of point on two separate issues?

A It's – the way DoDPI – or Department of Defense Polygraph Institute –

Q Tell him what DoDPI – because we'll be hearing about that.

A That's Department of Defense Polygraph Institute. Their policy is that it has to be a score of plus six or better with a plus in both of the . . . spots.

Q Is it not plus four or better?

A No, plus six.

Thus, using the standard claimed by Mr. Sosnowski, the defendant would have passed the polygraph, but he did not pass based upon the standard applied by Agent Richards. The trial court's determination credits the testimony of Richards, and the record supports this decision.

The defendant's final argument as to his claim that he passed the polygraph is that the State did not present proof that immunity was denied to him because he failed the polygraph, saying, "[I]t is just as probable that [the District Attorney General] forgot about the immunity agreement, or that [the Assistant District Attorneys] who presented the case to the grand jury on June 30, 2002, were unaware of the immunity agreement." It appears that this argument, also, is presented for the first time on appeal. In view of the fact that the trial court devoted four lengthy hearings to the defendant's motion to dismiss the indictment, it is somewhat surprising for him now to speculate that he was indicted only because the District Attorney General "forgot" about the immunity

agreement or his assistants were "unaware" of it. In fact, at the November 25, 2002, hearing, the trial court asked if it was "the state's position that this agreement was not fulfilled because [the defendant] did not pass the polygraph examination successfully," and the District Attorney General responded, "Yes, that is . . . the state's position." This claim is without merit.

### III. Fairness of Polygraph Examination

Within this category, we will consider the defendant's claims that the polygraph administered to him by the FBI was "defective and unreliable" because of the manner in which it was administered, that a second polygraph should have been given by Agent Richards after the first proved to be inconclusive, and that, in denying immunity to the defendant, the State breached its covenant of good faith and fair dealing.

First, we will review the defendant's claim that, in administering the polygraph, the FBI was acting as an "agent" of the State. Citing State v. Goodman, 643 S.W.2d 375, 379 (Tenn. Crim. App. 1982), the defendant argues that "when the State uses FBI facilities for a scientific test, the FBI is serving as an agent for the state." Although this language is taken directly from Goodman, its facts are so dissimilar to those of the present appeal that its reasoning is not applicable. In Goodman, the FBI had conducted a hair and fiber analysis for the State, and a copy of its report was provided to defense counsel at a pretrial discovery conference. However, because the expert who prepared the report had a heart attack and was unable to testify, another FBI expert reanalyzed the material and prepared a second report, which was not available until he came from Washington, D.C., to testify at the trial. His report was given to defense counsel the second day of trial.

Apparently, Goodman argued that the State had failed to comply with Tennessee Rule of Criminal Procedure 16(a)(1)(D) which requires that the State, upon request, "permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the State, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general." In response to the State's argument that the report regarding the retesting was not within the "possession, custody or control of the State," as contemplated by Rule 16, this court concluded, as the defendant in the present appeal has quoted, that the FBI is an agent of the State "[w]hen the state utilizes the facilities of the F.B.I. Laboratory for various scientific tests." Goodman, 643 S.W.2d at 379. This determination, however, is not applicable to the present appeal for several reasons. In Goodman, it appears that the request for the testing of hair and fiber evidence, as well as for the retesting, was solely that of the State, with the defense having no say as to whether the evidence would be tested, and if so by whom, and no indication that the defense even had prior knowledge that the testing was being performed. In the present appeal, by contrast, the parties agreed that the defendant would submit to a polygraph examination which would be administered by the FBI. The reason the FBI was selected to administer the test was explained by defense counsel at the November 25, 2002, hearing when he said "that the FBI was selected believing that it was a neutral and it would provide a reliable and scientific valid polygraph report." The testimony of Agent Richards was that the polygraph was administered to the defendant at the

Knoxville FBI office. Blount County detectives were at the FBI office intending to question the defendant at the time he was to be polygraphed. Then, Agent Richards questioned him regarding criminal activity unrelated to the subject of the polygraph examination. The nature of the questioning implies that Agent Richards had obtained information from Blount County personnel regarding the unrelated activities. In this regard, to the extent of that questioning, it would appear that Agent Richards was acting not as a "neutral" polygraph examiner but, instead, as a law enforcement agent applying investigative techniques to obtain information. As to the results, the State learned, on March 5, 2002, the same day as did the defense, that absent an FBI policy requiring that a test result be shown as deceptive when a test subject changed a response, the defendant's result would have been "inconclusive," which still would have meant that the defendant did not pass the test.

Contending that the polygraph examination was unfair, the defendant argues on appeal that the trial court made a Tennessee Rule of Criminal Procedure 12(e) "finding" that "it would be difficult for anyone to pass the polygraph under the circumstances this test was administered" and that this "finding is conclusive that this was a defective and unreliable test:"

> [DEFENSE COUNSEL]: Did your Honor make findings as to the materiality of the provision with regard to passing the polygraph?
>
> THE COURT: Well, . . . I'll tell you . . . what's been in my mind about that.
>
> [DEFENSE COUNSEL]: That would be fine.
>
> THE COURT: It's – from the testimony of, well, two or three different people, [previous defense counsel] being one and [the defendant] being another and Mr. Sosnowski being another, I just did not feel like that a test could be given successfully under those circumstances and . . . of course, Mr. Richards said it was inconclusive, and that would be understandable if he was upset and disturbed as has been described here. Is that –
>
> [DEFENSE COUNSEL]: So what the Court's saying is that the test under these circumstances was just not going to produce a valid result or what?
>
> THE COURT: Evidently it didn't. Even Mr. Richards said it was inconclusive, and – well, I don't know, like you mentioned yourself, you don't know a lot about the polygraph test, but from what I've heard, it would be very hard for a person to successfully get a fair hearing on a test in the condition that . . . has been described to me

the condition he was in when this was administered by Mr. Richards.

The parties and the trial court discussed the proof at great length at the conclusion of the January 7, 2003, hearing, and the comments upon which the defendant relies to make this argument were among those made by the trial court. We disagree with the defendant's analysis as to the court's statement, for, considering the context, it appears to have been a comment, and an ambiguous one at that, rather than a finding. Even if it were the latter, it would not be helpful to the defendant, for the trial court said that, based upon "the condition [the defendant] was in" when he took the polygraph, "it would be very hard for a person to successfully get a fair hearing." While this comment is somewhat unclear, the court appears to have been referring to the defendant's state of mind when he took the test. We do not believe that the trial court's comments upon which the defendant relies can be interpreted as a finding that the defendant's examination was improperly given or that the results were unreliable because of bad faith on behalf of the State. Also, as we have noted, Agent Richards testified that he saw nothing that would have led him to reschedule the test. Nothing in the record reflects that the defendant or his counsel requested a rescheduling. Given the record and the lack of detailed findings of fact by the trial court, we cannot conclude that the State acted in a way that would entitle the defendant to another polygraph examination pursuant to the agreement he made with the State.

Utilizing Mr. Sosnowski's testimony, the defendant argues that the polygraph examination was not fairly scored and that the letter agreement was breached because he was not given a second polygraph. He asserts, without references to the record or supporting authority, that "[o]bviously the parties intended that [the defendant's] polygraph would be administered fairly under generally accepted polygraph standards and that [the defendant] would be provided a fair opportunity to pass the examination." The problem with his argument as to the alleged mutual understanding to use "generally accepted polygraph standards" is that the agreement provided that it was to be administered by the FBI and that immunity would be granted if the defendant "passed." While the agreement is silent as to the testing standards which were to be applied, there is no basis for our concluding that they were to be other than the standards used by the FBI, which Agent Richards testified differed from those of the American Polygraph Association.

The defendant argues that the State "forfeited [the defendant's] immunity on a mistake of fact," asserting that "Mr. Richards graded the polygraph as 'inconclusive,'" entitling him, pursuant to FBI policy, to "another polygraph." As we will explain, the facts do not support this conclusion. While Agent Richards would have scored the test as inconclusive based solely on the defendant's responses to the polygraph questions, he, in fact, scored it as deceptive because of FBI policy regarding a subject's changing an answer, as the defendant did. It was not until March 5, 2002, after Richards had retired from the FBI, that he reviewed the test and advised the State that, absent the FBI policy regarding a changed answer, the test would have been scored as inconclusive. The State then attempted to arrange another polygraph by the FBI, which declined the request. In support of this argument, the defendant asserts, without making an appropriate reference to the record, that "Mr. Richards offered another polygraph to [the defendant] and [the defendant] agreed to take another

polygraph pursuant [to] FBI policy." However, the record does not support this claim. In fact, Agent Richards agreed on cross-examination, as we have previously set out, that FBI policy was that if a test result came back as inconclusive, the subject could request and would then be given another test. He said he was not asked to retest the defendant and FBI policy was that if the first test showed deception, the subject would not be retested.

The agreement was that the defendant would not receive immunity unless he "passed" the polygraph examination administered by the FBI. While the defendant complains that the examination should have been scored as inconclusive rather than as deceptive, the fact remains that, according to Agent Richards, the defendant did not pass the examination. Accordingly, he was not entitled to receive a grant of immunity. As to whether the defendant was entitled to a retest, the agreement considered only the pass/fail possibility and was silent as to a second polygraph. In arguing that he was entitled to a retest, the defendant inconsistently relies upon the FBI policy which permitted a retest upon request following an inconclusive test, while ignoring its policy that, if a subject changed his or her answer, scored a test as deceptive which otherwise would have been inconclusive. Only if, by FBI scoring or policy, a test result were inconclusive, which the defendant's was not, would a subject be entitled to a retest. Thus, we disagree with the defendant's analysis that the parties made a "mistake of fact." Rather, as the parties agreed, the FBI administered and scored the test and, following its policy, determined that the defendant's responses were deceptive, meaning that he was not entitled to a retest. Even had the test initially been scored as it was at the March 5 rescoring, the defendant still would not have "passed" the test. There is no basis for our assuming the parties intended other than that if the defendant did not pass the test, he would not be granted immunity, or that he would be retested if the first test was inconclusive. This argument is without merit.

Relying on Howington, the defendant argues that the "State did not act in good faith or by fair dealings:" (1) "by administering a defective and unreliable" first polygraph; (2) by refusing to provide a retest following the "inconclusive [first] test as required by generally accepted polygraph standards;" and (3) by refusing to provide a retest as agreed on March 5, 2002, "by 'another polygraph' examiner when the FBI declined to retest" the defendant. We will review these claims.

The argument that the first polygraph examination was "defective and unreliable" relies primarily on the testimony of Mr. Sosnowski, which disputed that of Agent Richards who administered the test. By its finding, the trial court credited the testimony of Richards, and, as we previously have explained, the records supports this determination. While the defendant may point to standards of certain groups pursuant to which the defendant would have been given a second polygraph examination, the letter agreement provided that the FBI was to administer the polygraph to the defendant, and there is no basis for assuming that other than FBI policies were to apply. There is no proof that Agent Richards deviated from FBI standards in the testing procedure. While the defendant argues on appeal that "the trial court erroneously failed to apply contract principles or constitutional good faith and fairness to the State's actions," he has not explained how adherence to FBI testing procedures, as the agreement called for, violated his rights. The fact that application of

the standards of the American Polygraph Association would give him the desired result does not mean that his rights were violated simply because other standards were applied. The claim that the State acted in bad faith by not retesting the defendant following the March 5, 2002, hearing is without merit because, as we have explained, the State attempted to have the defendant retested, but the FBI refused to do so. Accordingly, we conclude the claims that the State did not act in good faith or deal fairly are without merit.

## IV. Continuance of Hearing on the Defendant's Motion

The defendant asserts that the trial court erred by not ruling on his "motion to dismiss at the conclusion of the State's evidence presented on November 5, 2003 [sic] and by directing *sua sponte* that the State present additional proof." Additionally, on this point, he argues that the "ruling on the motion to dismiss at the conclusion of the State's proof[] must be viewed as a Rule 29 motion for judgment of acquittal." In making this claim, the defendant refers neither to the record nor to any legal authorities.

Since there was no hearing on November 5, 2003, the date the defendant argues the trial court should have ruled on his motion to dismiss, it is unclear as to which date he intended to refer, especially since there were hearings both on March 5, 2002, and November 25, 2002. However, since the parties believed, when the March hearing was continued, that the defendant would be retested by the FBI, we presume that he intended to refer to the November 25, 2002, hearing. At that hearing, the trial court advised that it wished to hear the testimony of Agent Richards, who was not present, although his report had been entered as an exhibit. The defense refused to concede that Richards would testify in accordance with the report, meaning that it could not be considered in lieu of his testimony. The trial court advised that the matter would be taken "under advisement" and that the parties should submit "everything else" they wanted. The defendant declined the court's invitation to have Mr. Sosnowski, who was present in the courtroom, testify at the hearing. The record does not reflect that defense counsel asked the court to rule that day on his motion or objected to a continuation of the matter until December 30, 2002. Accordingly, we conclude that this claim is without merit.

Citing United States v. Hall, 730 F. Supp. 646, 652 (M.D. Pa. 1990), the defendant argues that the trial court used an incorrect standard when it "resort[ed] to a rigid, literal approach in construction of the agreement's language" and concluded that the State was justified in denying immunity to him. Other than the fact that the trial court ruled against the defendant, we do not understand how the trial court was "rigid [and] literal" in its interpretation of the contract. The facts in Hall are not helpful to the defendant's argument for, in that case, the court determined the prosecutor's asserting that, at the time of the defendant's guilty plea, he was not a "target" of any other investigation reasonably could have been assumed by the defendant to mean that civil penalties would not be sought from him. Thus, while the prosecutor in Hall may have sought an advantage by taking a narrow view of the definition of "target," we do not understand, and the defendant does not attempt to explain, how its holding is relevant to the present appeal. In fact, the principles by

which an immunity agreement should be interpreted were explained by United States v. Macchia, 861 F. Supp. 182, 187 (E.D.N.Y. 1994):

> Under established principles, the Immunity Agreement must be interpreted according to principles of contract law. See United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991). Under general principles of contract law, "where the language of a contract is unambiguous, the parties' intent is discerned from the four corners of the contract." See id.; see also Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990). Moreover, "[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." Metropolitan Life, 906 F.2d at 889. Indeed, the "court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.'" Id. (quoting Bethlehem Steel Co. v. Turner Construction Co., 2 N.Y.2d 456, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957)).

In the present appeal, we conclude that the trial court interpreted the immunity agreement in accord with the principles of contract law. We disagree with the defendant's claim that, somehow, the court erred in interpreting the contract. In fact, some of the various claims which the defendant has made on appeal, as to the intent and provisions of the contract, were not raised until approximately four years after the polygraph examination was administered to the defendant and were not voiced by counsel who represented the defendant at the time and, in fact, are presented for the first time on appeal. As for the numerous other arguments made by the defendant, many of which are based upon various provisions of the Restatement (Second) of Contracts, they depend upon his analysis of the facts, with which we disagree. There is no basis for concluding other than that the parties intended that the FBI administer and score the test, using FBI policies. By these, the results were, at best for the defendant, inconclusive, which would not entitle him to a grant of immunity. While the defendant did make statements to law enforcement officials, he has not shown that he inculpated himself in a crime, an important consideration in assessing the value of his statements. He has not shown that he was treated unfairly by the State in this process. While the State might have asked for a retesting in 1998 had it known that the raw score of the defendant's test would have shown the result to be inconclusive, neither party learned of this fact until March 5, 2002, when the State unsuccessfully attempted to have him retested. Contrary to the defendant's assertions, Agent Richards did not testify that he would have retested the defendant in 1998, had a retest been requested. In fact, his response on this issue, given four years after the first test and after he had retired from the FBI, was ambiguous. We have carefully considered all of the arguments made by the defendant in his briefs and conclude that they are without merit. The record supports the determination of the trial court that the defendant is not entitled to a grant of immunity.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the trial court's order denying the motion to dismiss the indictment but remand for entry of corrected minutes reflecting that the trial court denied the defendant's motion to dismiss.

_____

ALAN E. GLENN, JUDGE